**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

DEXTER SHAW,

    Plaintiff,

  v.

STEVE UPTON; WARDEN ROBERT
TOOLE; JOHN PAUL; JANET BREWTON;
ROY SABINE; MILTON SMITH; and LISA
FOUNTAIN,

    Defendants.

CIVIL ACTION NO.: 6:16-cv-6

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion for Summary Judgment.
Doc. 145.   For the following reasons, I **RECOMMEND** the Court **GRANT** Defendants'
Motions for Summary Judgment, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the
appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

## BACKGROUND

Plaintiff, who is currently housed at Hays State Prison in Trion, Georgia, filed this
lawsuit under 42 U.S.C. § 1983.   Doc. 1.   Plaintiff brings several claims challenging the
conditions of his confinement at Georgia State Prison ("GSP") between his March 13, 2014
arrival and his November 10, 2014 transfer back to Valdosta State Prison ("VSP").   Id.   After
the Court's requisite frivolity review, docs. 4, 23, 33, and rulings on Defendants' motions to
dismiss, docs. 25, 45, 60, 62, the following monetary damages claims remain: (1) a First
Amendment free exercise claim against all Defendants; (2) a retaliation claim against Defendants
Upton and Toole for Plaintiff's long-term placement in administrative segregation and

subsequent assignment to the Tier II program; and (3) an access-to-courts claim against

Defendants Toole, Smith, and Fountain.   Doc. 60 at 27; Doc. 62.   All claims concerning events

occurring in 2010 were previously dismissed by this Court at frivolity review due to the statute

of limitations.   Doc. 4 at 10; Doc. 33.   Thus, the only claims that remain concern events which

occurred in 2014.[1]   It is also important to note this Court granted Plaintiff's motion regarding

Defendants' exhaustion defense, concluding Defendants waived any exhaustion of administrative

remedies argument relating to Plaintiff's free exercise claim.   Doc. 168 at 23–26.   Therefore,

the Court will not address this argument further.   See Doc. 145-1 at 13–14.

## UNDISPUTED MATERIAL FACTS[2]

On March 13, 2014, Plaintiff Dexter Shaw was transferred from the Special Management

Unit ("SMU") at Georgia Diagnostic and Classification Prison ("GDCP") to GSP.   Doc. 145-1

at 1; Doc. 178 at 18.   On November 10, 2014, Plaintiff was transferred from GSP to VSP.

Doc. 145-1 at 10; Doc. 178 at 22.   Plaintiff's claims in this action concern the time he was

incarcerated at GSP from March to November 2014.

Defendants' respective roles during this period are relevant to Plaintiff's claims.

Defendant Toole was the Chief Warden at GSP.   Doc. 145-2 at 2.   Defendant Smith was the

Chief Grievance Counselor at GSP.   Doc. 145-13 at 1.   Until August 2014, Defendant Paul was

GSP's Deputy Warden of Care and Treatment.   Doc. 147-2 at 1–2.   Defendant Brewton worked

---

[1]     Plaintiff continues to discuss events that occurred in 2010 and other claims the Court has already
dismissed.   The Court declines to address these arguments.

[2]     Plaintiff submitted a "Statement of Disputed Facts."   Doc. 178 at 18–26.   However, Plaintiff
does not actually dispute the majority of facts listed in this section.   Plaintiff has also submitted separate
sections entitled "Plaintiff's Facts" and "My Statement of Disputed Fact."   The Court has determined
which facts are undisputed based on the parties' briefing.   The recited facts represent the facts in the
record and draw all reasonable inferences in the light most favorable to Plaintiff, the non-moving party.
See Peppers v. Cobb County, 835 F.3d 1289, 1295 (11th Cir. 2016).

as a unit manager at GSP until August 2014, when she became the Deputy Warden of Care and Treatment.   Doc. 145-12 at 1–2.   Defendant Sabine was GSP's Health Services Administrator. Doc. 145-14 at 1.   Defendant Upton was the Georgia Department of Corrections ("GDC") Field Operations Manager until July 2014, when he began working as the Deputy Director of Facilities.   Doc. 145-7 at 1.   Defendant Fountain was the GDC's Senior Investigator of the Southeast area and the interim Manager of Inmate Affairs.   Doc. 145-8 at 1–2.

## I.      Plaintiff's Vegan Diet and GDC Policies on Diets

One of Plaintiff's pending claims arises from Defendants purportedly denying Plaintiff access to vegan meals at GSP.   At the time of his transfer to GSP, Plaintiff had a profile for a restricted vegan diet due to Plaintiff's religious beliefs.   Doc. 145-1 at 1; Doc. 178 at 18.

Between March 2014 and November 2014, GSP did not participate in the Alternative Meal Program or offer mass-prepared Alternative Meal Program choices, such as the Vegan Plan or Restricted Vegan Plan.   Doc. 145-1 at 2; Doc. 178 at 18.   If a GSP inmate wanted to participate in an Alternative Meal Program, he was at least initially required to complete the Inmate Alternative Entrée Meal Participation Form ("Participation Form"), which was set forth as Attachment One to GDC Standard Operating Policy ("SOP") IVL01-0027, and deliver it to the individual designated by GSP to receive Alternative Meal Program requests. Doc. 145-1 at 2; Doc. 178 at 18, 29.   The designee would review a request for a Restricted Vegan Meal Plan within two business days.   Doc. 145-1 at 2; Doc. 178 at 19.   Requests received by the facility designee that could not be placed into a Restricted Vegan or Vegan Meal Plan were forwarded to the Field Operations Manager ("FOM") for the Facility and the Central Office Chaplain for approval.   Doc. 145-1 at 2; Doc. 178 at 19.   The Central Office Chaplain would then consult with Legal Services, Corrections Division and Food and Farm Services on the feasibility and

approval of the request.   Doc. 145-1 at 2; Doc. 178 at 19.   If the request was approved and the inmate was not held at a facility which offered the Restricted Vegan Meal Plan (like inmates held at GSP), the request would be forwarded to the facility's FOM so the inmate could be transferred.   Doc. 145-1 at 2; Doc. 178 at 19.   An inmate who was approved for a Restricted Vegan Meal Plan but not assigned to a facility which served Restricted Vegan Meal Plans was to be transferred to an accommodating facility within 15 days of approval under GDC policy. Doc. 145-1 at 2; Doc. 178 at 19.   The policy did not expressly address a situation like Plaintiff's—where the inmate was already approved to receive vegan or restrictive vegan meals based on their religious beliefs at one facility but was then transferred to another facility which did not offer vegan or restrictive vegan meals.   Doc. 145-1 at 2–3; Doc. 178 at 19.

It is undisputed, and records confirm, Plaintiff did not submit a Participation Form while housed at GSP between March 13, 2014, and November 10, 2014.   Doc. 145-1 at 3; Doc. 178 at 19.   Plaintiff states he did not attempt to submit a Participation Form at GSP because he did not believe it was required under GDC policy, namely, because he had been approved at his prior institution.   Doc. 145-1 at 3; Doc. 178 at 19.   Plaintiff is familiar with the requirements set forth in GDC SOP IVL01-0027, as he previously submitted a Participation Form on March 2, 2011. Doc. 145-1 at 4; Doc. 178 at 27.   Plaintiff also filed a lawsuit pertaining to his housing at GSP in 2010 in which his vegan meal plan was at issue.   Id.

Although Plaintiff did not submit an Alternative Meal Participation Form while housed at GSP, the procedure for submitting requests was available at that facility.   Doc. 145-1 at 3; Doc. 178 at 19.   If Plaintiff had submitted a Participation Form at GSP, the form would have been forwarded to the FOM and Central Office Chaplain for further review.   Doc. 145-1 at 3; Doc. 178 at 19.   Defendant Paul served as the facility designee at GSP who received and

forwarded inmates' requests to participate in the Alternative Meal Program between March and August 2014.   Doc. 145-1 at 3; Doc. 178 at 19.   Defendant Steve Upton was the FOM who oversaw GSP between March and July 1, 2014, and was responsible for reviewing inmates' completed Participation Forms.   Doc. 145-1 at 3; Doc. 178 at 19.   Defendant Upton was promoted to Deputy Director of Facilities on July 1, 2014.   Doc. 145-1 at 4; Doc. 178 at 19.   As Deputy Director, Defendant Upton did not have a direct role in reviewing or approving inmates' requests to participate in the Alternative Meal Program.   Doc. 145-1 at 4; Doc. 178 at 19.

Defendant Brewton was the Deputy Warden of Care and Treatment at GSP between August and November 2014.   Doc. 145-1 at 4; Doc. 178 at 20.   Defendant Brewton was not the designee at GSP for processing inmate Alternative Meal Program requests pursuant to GDC SOP IVL01-0027.   Doc. 145-1 at 5; Doc. 178 at 20.   If Plaintiff had submitted a request for a vegan diet between August 2014, when Defendant Brewton became Deputy Warden of Care and Treatment, and November 2014, Defendant Brewton would have submitted the transfer request for Plaintiff, after it had already been approved at the state level.   Doc. 145-1 at 5; Doc. 178 at 20.   Defendant Brewton did not have the final authority to grant or initiate a transfer. Doc. 145-1 at 5; Doc. 178 at 20.

Defendant Roy Sabine was the Health Services Administrator ("HSA") at GSP between June 1, 2014, and November 30, 2016.   Doc. 145-1 at 5; Doc. 178 at 20.   As the HSA, Sabine served in an administrative, budgetary, and operational planning role connected to the provision of health care to inmates at GSP.   Doc. 145-1 at 5; Doc. 178 at 20.   Defendant Sabine had no role in reviewing, approving, or forwarding an inmate's request for a vegan diet.   Doc. 145-1 at 5; Doc. 178 at 20.   Thus, Defendant Sabine had no role in denying Plaintiff a vegan diet. Doc. 145-1 at 5; Doc. 178 at 20.   If Plaintiff had submitted a request for a vegan diet to Sabine,

Sabine would have forwarded the request to the Warden, the Deputy Warden of Care and Treatment, and the Chaplain for further handling.[3]   Doc. 145-1 at 5–6; Doc. 178 at 20.

Importantly, Plaintiff did raise concerns regarding a restrictive vegan diet to Defendant Brewton while at GSP.   Doc. 145-1 at 5; Doc. 178 at 20.   At that time, Defendant Brewton advised Plaintiff to submit a Participation Form in accordance with GDC SOP IVL01-0027. Doc. 145-1 at 5; Doc. 178 at 20.   Plaintiff did not do so.

## II.    Grievances

Plaintiff's access-to-courts claim is based on allegations that certain Defendant's interfered with Plaintiff's ability to submit grievances at GSP, and this, in turn, resulted in the dismissal of Plaintiff's prior lawsuit based on a failure to exhaust available administrative remedies.   Thus, facts related to Plaintiff's grievances are material to analyzing Defendants' Motion for Summary Judgment.

### A.    Plaintiff's Grievances

On April 29, 2014, Plaintiff filed Grievance Number 173334, contending he was being denied access to the grievance policy, specifically, a grievance allegedly filed on March 27, 2014, regarding vegan meals.   Doc. 145-1 at 6; Doc. 178 at 20.   In response, Defendant Milton Smith stated he did not deny Plaintiff access to the grievance procedure and Plaintiff did not meet the requirements for a transfer to an institution which offers a vegan diet.   Doc. 145-1 at 6; Doc. 178 at 20.   Smith further stated an inmate must reside at an institution for twelve months, with the last six months disciplinary free, before he was eligible for a transfer.   Doc. 145-1 at 6; Doc. 178 at 20.   On July 21, 2014, Warden Toole denied Plaintiff's grievance based on Smith's

---

[3]      The parties have devoted significant attention to Plaintiff's hunger strike and purported weight loss, which are related to the denial of vegan meals, but those facts are not germane to my analysis in this Report, and, therefore, I have not addressed them here.

statement.[4]   Doc. 145-1 at 6; Doc. 178 at 20.   Plaintiff appealed, and Defendant Fountain

approved the denial of Plaintiff's grievance appeal.[5]   Doc. 145-1 at 6; Doc. 178 at 20.

     Defendants Toole, Fountain, and Smith's responses to Plaintiff's Grievance Number

173334 were based on GDC SOP IIC05-0001, the policy which governs the inter-institutional

transfers of inmates.   Doc. 145-1 at 6; Doc. 178 at 20.   The policy provides that administrative

transfers, which are based on factors such as population redistribution or a change in the mission

of a facility, generally shall not be considered unless an inmate has been assigned to an

institution for twelve months and has not been found guilty of a major disciplinary report

infraction during the preceding six months.   Doc. 145-1 at 6–7; Doc. 178 at 20.   Typically, this

portion of the Inter-Institutional Transfer Policy does not apply to inmates who have been

approved to participate in a Vegan Meal Plan or a Restricted Vegan Meal Plan, pursuant to GDC

SOP IVL01-0027.   Doc. 145-1 at 7; Doc. 178 at 20.   Issues related to the Alternative Meal

Program under GDC SOP IVL01-0027 are addressed through the process set forth in that

procedure through the Deputy Warden of Care and Treatment, FOM, and Statewide Chaplain.

Doc. 145-1 at 7; Doc. 178 at 20.

     Plaintiff filed several other grievances while incarcerated at GSP, and the relevant ones

are described here.   Doc. 145-1 at 11; Doc. 178 at 22.   On June 12, 2014, Plaintiff filed

Grievance Number 175400, contending he was being housed in segregation for retaliatory

purposes.   Doc. 145-1 at 11; Doc. 178 at 22.   On July 2, 2014, Plaintiff filed Grievance Number

---

[4]    Plaintiff does appear to agree Defendant Smith made these statements, but he claims Defendant Smith only made them for "destruction and cover up" and Defendant Toole went along with the "cover up."   Doc. 178 at 20.

[5]    Defendant Fountain has since changed her name to "Lisa Upton," but the Court refers to her as Defendant Fountain for clarity purposes because this was her name at the time the events in dispute took place.

176537, complaining about the temperature in his cell and alleging meal accommodations were insufficient and caused him to fall.   Doc. 145-1 at 11; Doc. 178 at 22.   On July 21, 2014, Plaintiff filed Grievance Number 179534, alleging officers denied him medical care after a fall on July 15, 2014.   Doc. 145-1 at 12; Doc. 178 at 22.

### B.   July 31, 2013 Memorandum

On July 31, 2013, Defendant Fountain issued a memorandum relating to the Statewide Grievance Procedure, GDC SOP IIB05-0001.   Doc. 145-1 at 12; Doc. 178 at 23.   The July 31, 2013 memorandum stated a counselor should not provide a receipt upon acceptance of a grievance.   Doc. 145-1 at 12; Doc. 178 at 22.   Instead, under GDC policy, the Grievance Coordinator would evaluate whether an inmate had two pending grievances.   Doc. 145-1 at 12; Doc. 178 at 23.   Then, if the Grievance Coordinator determined an inmate had two active grievances, the inmate would not be given a receipt for the new grievance.   Doc. 145-1 at 12; Doc. 178 at 23.   The Grievance Counselor would advise the inmate he had two active grievances and he could withdraw one.   Doc. 145-1 at 12; Doc. 178 at 23.   Once the Grievance Coordinator determined which grievance to process, he would return the completed grievance receipt to the inmate.   Doc. 145-1 at 12; Doc. 178 at 23.

### III.   Plaintiff's 2014 Lawsuit ("Shaw I")

As noted above, Plaintiff's access-to-courts claim concerns dismissal of a prior lawsuit, which is described here.   On May 19, 2014, Plaintiff filed suit against John Paul, Milton Smith, the State of Georgia, and Robert Toole in Shaw v. State of Georgia, Case No. 6:14-cv-48 (S.D. Ga.) ("Shaw I").   Doc. 145-1 at 13; Doc. 178 at 23.   At issue in Shaw I was defendants' alleged failure to provide Plaintiff a vegan diet in accordance with his religious beliefs.   Doc. 145-1 at 13; Doc. 178 at 23.   After Plaintiff filed an amended complaint, the Shaw I defendants filed a

motion to dismiss based on Plaintiff's failure to exhaust his administrative remedies.[6]   Doc. 145-1 at 13; Doc. 178 at 23; Shaw I, ECF No. 43.   In response, Plaintiff stated he filed grievances on March 18 and 27, 2014.   Doc. 145-1 at 13; Doc. 178 at 23.   Plaintiff argued the grievances were not processed in accordance with GDC SOP IIB05-0001.   Doc. 145-1 at 13; Doc. 178 at 23.   The Court dismissed Plaintiff's complaint due to Plaintiff's failure to exhaust his administrative remedies.   Doc. 145-1 at 14; Doc. 178 at 23; Shaw I, ECF Nos. 65, 68. Plaintiff appealed to the Eleventh Circuit Court of Appeals but voluntarily dismissed his appeal. Doc. 145-1 at 14; Doc. 178 at 23.

## IV.   Plaintiff's Placement in Administrative Segregation at GSP

Plaintiff's final claim concerns his placement in administrative segregation at GSP.   On March 13, 2014, Plaintiff was transferred to GSP.   Upon arriving at GSP, Plaintiff was placed in administrative segregation and later, when the program came online, Plaintiff was assigned to the Tier II Administrative Segregation Program ("Tier II Program").   Doc. 145-1 at 14; Doc. 178 at 24.   Plaintiff's transfer to GSP was initiated by officials at the GDC's Central Office so that Plaintiff could to participate in GSP's Tier II program.   Doc. 145-2 at 8.

Prior to his transfer to GSP, Plaintiff was incarcerated in the SMU at GDCP in Jackson, Georgia.   Doc. 145-1 at 14; Doc. 178 at 24.   The Tier II Program was established at GSP in July 2014.   Doc. 145-1 at 14; Doc. 178 at 24.   The GDC's Tier Program was designed as a pathway for offenders to successfully transition from administrative segregation to lower security levels.   Doc. 145-1 at 14; Doc. 178 at 24.   GDC SOP IIB09-0003 governs the Tier II

---

[6]       In their Statement of Facts, Defendants cite to their original motion to dismiss, which was later denied as moot due to Plaintiff filing an amended complaint.   Shaw I, ECF Nos. 65, 68.   It was not until the second motion to dismiss the Shaw I defendants claimed Plaintiff did not exhaust his administrative remedies.   Shaw I, ECF No. 43.   The Court granted the second motion to dismiss for this reason.   Shaw I, ECF Nos. 65, 68.

Program, including the assignment, review, and appeal processes.   Doc. 145-1 at 15; Doc. 178 at 24.   Tier II of the GDC's Tier Program was designed to protect staff, offenders, and the public from offenders who pose a serious threat to the safety and security of the prison.   Doc. 145-1 at 15; Doc. 178 at 24.

An inmate may be assigned to the Tier II Program for a variety of reasons, including if the inmate is determined to pose a threat to the safe and secure operation of the prison or if the inmate has been transferred from the SMU at GDCP.   Doc. 145-1 at 15; Doc. 178 at 24.   The SOP governing Tier II states when an offender is initially assigned to the Tier II Program, the Classification Committee should hold a formal administrative segregation hearing within 96-hours of the inmate's placement in segregation.   Doc. 145-1 at 15; Doc. 178 at 24.   The Classification Committee's recommendation that an inmate be assigned to the Tier II Program is submitted to the Warden for approval or disapproval and, if approved, the inmate is provided written notification he has been assigned to the Tier II Program.   Doc. 145-1 at 15; Doc. 178 at 24.   An inmate may appeal his assignment to the Tier II Program by submitting written objections to the Director of Facilities Operations or his designee within three business days of receipt of notification of the assignment, after which the Facilities Director or his designee completes a review of the inmate's appeal.   Doc. 145-1 at 15; Doc. 178 at 24.

On July 16, 2014, the Classification Committee held an initial 96-hour segregation hearing for Plaintiff.   Doc. 145-1 at 15; Doc. 178 at 24.   The Classification Committee recommended Plaintiff's placement in the Tier II Program.   Doc. 145-1 at 16; Doc. 178 at 24.   The Tier II Program was explained to Plaintiff, and Plaintiff was provided an appeal form at the conclusion of the hearing.   Doc. 145-1 at 16; Doc. 178 at 24.   Defendant Toole approved the Classification Committee's recommendation.   Doc. 145-1 at 16; Doc. 178 at 24.   In either July

or August 2014, Plaintiff appealed his placement in the Tier II Program.   Doc. 145-1 at 17;

Doc. 178 at 25.   Plaintiff's appeal was denied.   Doc. 145-1 at 17; Doc. 178 at 25.   On

November 6, 2014, Plaintiff received a 90-day review of his placement in Tier II.   Doc. 145-1 at

17; Doc. 178 at 26.   The Classification Committee recommended placement in Phase One of the

Tier II Program based on Plaintiff's disciplinary reports, as well as his disruptiveness, which

included death threats to officers, refusing to allow officers to secure his tray flap, keeping paper

in his cell door window, projecting items, flooding, and exposing himself.   Doc. 145-1 at 17;

Doc. 178 at 26.   Defendant Toole approved the recommendation.   Doc. 145-1 at 17; Doc. 178

at 26.   On November 10, 2014, Defendant Smith input a transfer for Plaintiff to VSP, noting, per

Defendant Upton, Plaintiff should be transferred to participate in Phase One of the Tier II

Program.   Doc. 145-1 at 17; Doc. 178 at 26.   Plaintiff was transferred to VSP, a facility which

provides vegan diets, on this date.   Doc. 145-1 at 17; Doc. 178 at 26.

## DISCUSSION

### I.   Legal Standard

Summary judgment "shall" be granted if "the movant shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).   "A dispute about a material fact is genuine and summary judgment is

inappropriate if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.   However, there must exist a conflict in substantial evidence to pose a jury

question."   Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011)

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v.

Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).   "If the evidence [produced

by the nonmoving party] is merely colorable or is not significantly probative summary judgment

must be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 249 (1986) (citations omitted).

The moving party bears the burden of establishing there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23 (1986)). Once the party moving for summary judgment satisfies its initial burden, the burden shifts to the nonmoving party to come forward with specific facts showing a genuine dispute for trial. Hinson v. Bias, 927 F.3d 1103, 1115 (11th Cir. 2019). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011).

## II.  Plaintiff's Free Exercise Claim

### A.  Background

Plaintiff's free exercise claim arises from his March 13, 2014 transfer to GSP, an institution which did not accommodate his religious vegan diet. Doc. 178 at 18; Doc. 145-1 at 1. Plaintiff brings his free exercise claim against all seven remaining Defendants. GDC offers an Alternative Meal Program under which inmates with religiously motivated diet restrictions

12

receive a corresponding dietary accommodation, including a vegan diet.   Doc. 145-4 at 1–2, 11.

It is undisputed Plaintiff, at the time of his transfer to GSP, was enrolled in this Alternative Meal

Program.   Doc. 145-1 at 2; Doc. 145-3 at 12; Doc. 178 at 18.   It is also undisputed, at the time

of Plaintiff's transfer, GSP did not participate in this program or offer vegan diets.   Doc. 145-1

at 2; Doc. 178 at 18.   From the time of Plaintiff's arrival at GSP on March 13, 2014, to his

transfer to VSP on November 10, 2014, Plaintiff did not receive any vegan or restricted vegan

meals.[7]   Plaintiff initially submitted two Participation Forms requesting a vegan diet and later a

restricted vegan diet in 2009 and 2011.   Doc. 145-3 at 10–12, 13; Doc. 145-19 at 2; Doc. 153-2

at 3; see Doc. 178 at 27–28.[8]   It is also undisputed Plaintiff did not submit an additional

Participation Form while incarcerated at GSP because he believed it was not required.

Doc. 145-1 at 3; Doc. 178 at 19.   At various times when Plaintiff was housed at GSP in 2014,

Plaintiff contends he communicated to certain Defendants about his vegan diet through

grievances, verbal conversations, or both.   See Doc. 1 at 10–13; Doc. 160 at 3; Doc. 178 at 4.

**B.      Analysis**

In their Motion for Summary Judgment, Defendants argue: (1) Defendants cannot be held

liable under § 1983 because they were merely negligent, and (2) Plaintiff is not entitled to

---

[7]      The 2014 transfer was not the first time prison officials moved Plaintiff to GSP, despite GSP's inability to accommodate his religious diet.   Doc. 1 at 8–10; Doc. 4 at 2; Doc. 147-2 at 4; Doc. 145-11 at 1–3; see also Shaw v. Dodson ("Dodson"), 6:04-cv-122 (S.D. Ga.), ECF No. 417.   Officials transferred him to GSP on May 13, 2010, and he did not receive a vegan diet for approximately four months, until his transfer to another facility on August 20, 2010.   Doc. 1 at 8–10; Doc. 145-10 at 4; Doc. 145-11; see also Dodson, 6:04-cv-122 (S.D. Ga.), ECF No. 417; Doc. 178-1 at 2 (referring to Shaw as a "sleeper" at GSP in 2010).

[8]      In his brief, doc. 178 at 27–55, declaration, id. at 1–17, and multiple statements of facts, id. at 27–32, Plaintiff often cites to his original Complaint or his own declaration, which then cites to his Complaint.   When Plaintiff cites to a portion of his Complaint in his declaration, the Court accepts those portions of the Complaint as evidence for summary judgment purposes.   However, Plaintiff does not state he wishes to incorporate his Complaint by reference in its entirety.   Therefore, if Plaintiff does not discuss a portion of his Complaint in his declaration, the Court does not consider those portions of the Complaint evidence for summary judgment purposes.

compensatory or punitive damages for his de minimis injuries.   As explained below, the Court declines to address Defendants' second argument.[9]

Despite their incarceration, inmates must be afforded a "reasonable opportunity" to exercise their religious freedom.   Cruz v. Beto, 405 U.S. 319, 322 (1972).   Thus, in order to sustain a First Amendment claim, a prisoner must be able to show his ability to practice his faith was substantially burdened.   See Holt v. Hobbs, 574 U.S. 352, 357–58 (2015).   A "substantial burden" is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior . . . ."   Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, 980 F.3d 821, 831 (11th Cir. 2020) (quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214 (11th Cir. 2004)).   Suits brought by prisoners under the Free Exercise Clause commonly involve allegations that a prison policy or regulation unconstitutionally prohibited a sincerely held religious belief or otherwise unduly burdened the free exercise of religion.[10]   Prison regulations challenged under the First Amendment are subject to a more deferential reasonableness test. Davila v. Gladden, 777 F.3d 1198, 1212 (11th Cir. 2015).

Here, Plaintiff is not asserting an unreasonable prison policy substantially burdened his ability to practice his faith.   Rather, Plaintiff argues prison officials did not properly implement existing policies.   Plaintiff acknowledges the existence of a GDC policy that accommodates religious diets.   Doc. 178 at 2.   Plaintiff agrees there is an established policy that prohibits

---

[9]     The briefing in this matter was complete before the Eleventh Circuit Court of Appeals issued its decision in Hoever v. Marks, 993 F.3d 1353 (11th Cir. 2021), holding § 1997e(e) of the Prison Litigation Reform Act permits punitive damages absent a showing of physical injury.   It is unclear whether Defendants would continue to press their second argument in light of the decision in Hoever.

[10]    See, e.g. Holt v. Hobbs, 574 U.S. 352 (2015) (regarding a prison's grooming policy); O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) (challenging policies which prevented Muslim prisoners from attending certain prayer sessions); Cruz v. Beto, 405 U.S. 319 (1972) (challenging a prison program which rewarded participation, such as attending a weekly service, for adherents of certain faiths, but not all faiths).

inmates requiring religious diets from being held in facilities which do not accommodate that diet, and Plaintiff agrees he was familiar with that policy.   Id.   However, Plaintiff asserts Defendants have not adhered to this policy.   For instance, Plaintiff asserts Defendants have a "long standing practice" of not transferring or accommodating inmates enrolled in the Alternative Meal Program.   Id.   In other words, Plaintiff's does not contend some GDC policy or rule prohibited him from freely exercising his religion—rather, he claims Defendants did not properly *implement* or *adhere* to GDC policies, to his detriment.   The crux of Plaintiff's free exercise claim is Defendants failed to properly implement these policies when they transferred him to a facility which could not accommodate his religious diet and by keeping him at an unaccommodating facility.

Defendants argue they had no role in transferring Plaintiff to GSP.   Doc. 182 at 8. Defendants do concede, however, they misapplied GDC policies at least in some instances. Doc. 145-19 at 6–7.   For example, it is undisputed a prisoner participating in the Vegan Meal Plan or Restricted Vegan Meal Plan need not wait to request a transfer.   Doc. 145-1 at 7; Doc. 178 at 20.   Defendants argue their actions amount to, at most, a negligent misapplication of GDC policies rather than a deliberate effort to interfere with Plaintiff's free exercise rights. Doc. 145-19 at 6–7, 15–16.   They assert Plaintiff cannot sustain a free exercise claim where Defendants acted negligently, as negligent interference with religious exercise is not actionable under § 1983.   Id. at 15–16.

Absent evidence supporting a de facto policy of deviating from free-exercise-compliant policies or an inference of intentional conduct, a prison official's negligent failure to implement an existing policy designed to accommodate religious beliefs is insufficient to establish a Free Exercise Clause violation under § 1983.   Mbonyunkiza v. Beasley, 956 F.3d 1048, 1054–55 (8th

Cir. 2020); <u>Lovelace v. Lee</u>, 472 F.3d 174, 198–99 (4th Cir. 2006).   Regarding § 1983 liability

generally, the United States Supreme Court has stated, "[D]epending on the right, merely

negligent conduct *may not* be enough to state a claim."   <u>Daniels v. Williams</u>, 474 U.S. 327, 330

(1986) (emphasis added).

   In <u>Daniels</u>, a prisoner sought to recover damages for injuries allegedly sustained when he

fell on a prison stairway after slipping on a pillow negligently left by a guard on that stairway.

<u>Id.</u> at 328.   The Supreme Court concluded the "Due Process Clause is simply not implicated by

a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."

<u>Id.</u> (emphasis in original).   However, the Court's decision in <u>Daniels</u> did not discuss the state of

mind required to sustain a Free Exercise Clause claim.

   The Eleventh Circuit has also not specifically addressed what state of mind is required to

impose § 1983 free exercise liability.   <u>See</u> <u>Davila</u>, 777 F.3d at 1212 (discussing the substantial

burden standard and reasonableness test as applied to a challenged regulation); <u>Muhammad v.</u>

<u>Sapp</u>, 388 F. App'x 892 (11th Cir. 2010) (discussing the "reasonableness test" applied to prison

regulations but finding defendants were entitled to qualified immunity without fully analyzing

the First Amendment Claim).   The Eighth, Tenth, and Fourth Circuit Courts of Appeals require

something more than isolated acts of negligence.   <u>Mbonyunkiza</u>, 956 F.3d 1048 at 1054–55;

<u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1070–71 (10th Cir. 2009) (affirming the dismissal of an

inmate's claim kosher utensils were contaminated because, despite evidence prison officials

might have "imperfectly implemented the kosher requirements, or were even negligent," there

was "no basis to conclude that any of the defendants deliberately contaminated the kosher

utensils"); <u>Lovelace</u>, 472 F.3d at 198–99.

   For example, in <u>Mbonyunkiza</u>, the Eighth Circuit considered whether the service of

multiple pork-containing meals to a Muslim prisoner created a genuine dispute as to a Free Exercise Clause violation.   956 F.3d 1048.   Partially relying on the word "prohibit" within the Free Exercise Clause and Daniels, the court reasoned isolated mistakes are insufficient to impose § 1983 liability.   Id. at 1054–55.   The court held correction officials could not be held liable for a negligent failure to implement food policies designed to accommodate the plaintiff's religious beliefs.   Id.   The court noted "evidence of pervasive 'mistakes' might support a claim that NCF had a *de facto* policy of ignoring or deviating from its free-exercise compliant policies, [but] no such evidence was presented here."   Id. at 1055.   Similarly, in White v. Jackson, a district court examined misapplied policies where a prison medical administrator mistakenly believed inmates needed a certain pass to participate in a Ramadan-compliant pill call.   No. 2:16-cv-597, 2017 WL 2963862, at *8 (E.D. Va. Jun. 28, 2017).   The court found the plaintiff had produced no evidence the administrator ever suspected she was wrong in her policy application, and thus, no evidence her conduct was willful or more than merely negligent.   Id.

On the other hand, the Fourth Circuit did find a genuine dispute of material fact existed as to a prisoner's Free Exercise Claim when a prison guard's actions raised an inference of intentional conduct.   Lovelace, 472 F.3d at 195–96, 201–202.   In Lovelace, a prison guard said he saw an inmate take a food tray during the Ramadan fast, resulting in the revocation of that inmate's religious diet.   Id. at 195.   In an incident report and in conversations with superiors, the guard repeatedly affirmed he had seen the inmate take a food tray.   Id.   After the initiation of a lawsuit, the guard submitted an affidavit saying he had mistakenly misidentified an inmate with the same name.   Id.   But in a second affidavit, the guard changed his story and said he simply confused the plaintiff-inmate with another inmate.   Id.   However, the record showed the guard had significant close contact with the plaintiff-inmate, which contradicted the guard's

claim he simply misidentified the inmate.   Id.   The implausibility of the guard's story, along with his changing narrative, cast serious doubt on whether the guard made an honest mistake. Id.   Although the Fourth Circuit held a defendant must consciously or intentionally interfere with a prisoner's First Amendment rights to be liable under § 1983, the court concluded these facts raised a genuine dispute as to whether the guard intentionally deprived the inmate of his religious diet.   Id. at 201–202.

Further, the mere denial of a grievance "without person[al] participat[ion] in the unconstitutional conduct brought to light by the grievance, is insufficient to establish § 1983 liability."   Williams v. Adkinson, No. 3:17-cv-184, 2020 WL 982007, at *5 (N.D. Fla. Feb. 7, 2020); see also James v. Taylor, No. 5:15-CV-00266, 2016 WL 1696211, at *4 (M.D. Ga. Mar. 22, 2016) ("[Plaintiff's] presentation of a grievance regarding the denial of his vegan food, which was denied by the Warden, does not form a basis for Section 1983 liability."); Robinson v. Owens, No. CV509-056, 2011 WL 474976, at *2 (S.D. Ga. Jan. 4, 2011) ("[A] prison official's rejection of a grievance cannot form the basis of a § 1983 claim."); Gardner v. Riska, No. 3:09-cv-482, 2010 WL 11506602, at *2 (M.D. Fla. Dec. 27, 2010) (dismissing a free exercise claim when defendants denied plaintiff-inmate's grievances for lack of a causal connection as "[t]he fact that [defendants] denied his grievances regarding this matter is insufficient to impose liability under § 1983"), aff'd, 444 F. App'x 353 (11th Cir. 2011).   These cases further confirm a mere negligent act, including negligent, improper denial of a grievance, is insufficient to impose § 1983 liability in this Circuit.

Plaintiff has cited no case holding the negligent failure to implement a prison policy intended to protect inmates' free exercise of religion is actionable under § 1983.   As discussed further below, Plaintiff has not pointed to any facts demonstrating these particular Defendants

were more than negligent in failing to accommodate Plaintiff's diet.   Additionally, Plaintiff has

not presented sufficient evidence to create a genuine dispute regarding a de facto policy or an

inference of intentional conduct—the two primary exceptions where a prisoner can successfully

challenge prison officials' failure to implement a policy designed to accommodate religious

beliefs.   Importantly, Plaintiff does not dispute he understood how to fill out a Participation

Form or Defendant Brewton told him he should.   Even so, Plaintiff never completed a

Participation Form while at incarcerated at GSP.   Doc. 145-1 at 3; Doc. 178 at 19.   I now

address the evidence as to each Defendant's alleged conduct related to the purported denial of

vegan meals.

### 1.   *Defendant Sabine.*

Plaintiff asserts a First Amendment free exercise claims against Defendant Sabine.

Doc. 62 at 2.   Plaintiff states he spoke with Defendants Brewton, Upton, Toole, and Paul and,

despite their awareness, these Defendants failed to remedy the ongoing denial of his vegan

meals.   See Doc. 1 at 10–13; Doc. 160 at 3; Doc. 178 at 4.   On the other hand, nowhere does

Plaintiff claim he wrote or discussed the denial of his religious diet with Defendant Sabine.[11]

Thus, Plaintiff's First Amendment claims against Defendant Sabine should fail.

### 2.   *Defendant Smith.*

In Grievance Number 173334, Plaintiff complained Defendant Smith was abusing the

grievance process to conceal the fact Plaintiff was not receiving his religiously required diet.

Doc. 25-4 at 7.   Plaintiff also stated he was being denied his religiously required diet and he had

---

[11]      In his Complaint, Plaintiff specifically lists his claims for relief.   Doc. 1 at 24–25.   In this
section of his Complaint, Plaintiff brings his claims regarding his religious diet only against Defendants
Toole, Upton, Paul, and Smith.   Id.   In Defendants' Statement of Material Facts, they assert "Sabine did
not deny Plaintiff a vegan diet.   He had no role in reviewing, approving, or forwarding an inmate's
request for a vegan diet."   Doc. 145-1 at 5.   In Plaintiff's "Statement of Disputed Facts," he notes this
fact regarding Defendant Sabine is "undisputed."   Doc. 178 at 20.

been previously approved to receive this diet.   Id.   Defendant Smith, the Chief Grievance

Counselor at GSP from 2011 to 2017, recommended Defendant Toole, the Warden, deny

Plaintiff's Grievance Number 173334.   Doc. 25-4 at 12; Doc. 145-13 at 2–3; Doc. 145-19 at 5–

6.

Defendants argue, at most, Defendant Smith was negligent in his misunderstanding of

GDC policies.   Doc. 145-19 at 16.   Defendants point to the text of Defendant Smith's

recommendation and Defendant Smith's affidavit.   Doc. 145-19 at 16; Doc. 182 at 10–11.

Defendant Smith made his recommendation—that Grievance Number 17334 be denied—based

on his understanding of SOP IIC05-0001, the prison's policy governing institutional transfers.

Doc. 145-13 at 2–3.   Smith wrote, "Georgia State Prison does not offer [v]egan meals" and until

Plaintiff met "the requirements for transfer to another facility, he will remain at Georgia State

Prison . . . inmate must be at present institution for twelve months with last six months

Disciplinary free."   Doc. 25-4 at 12; Doc. 145-13 at 2–3; Doc. 145-19 at 5–6.   In his affidavit,

Defendant Smith concedes the Inter-Institutional Transfer Policy should not typically apply to

inmates already approved for a Restricted Vegan Meal Plan and his recommendation was a

mistake.   Doc. 145-13 at 3.   Defendant Smith states, "I did not intentionally deny Shaw vegan

diet.   My response . . . was based on a misapplication as to how the policies related to inter-

institution transfers and alternative meal programs worked together."   Id. at 3.

Plaintiff has provided no evidence to contradict Defendant Smith's assertion his response

was an isolated mistake.   Plaintiff makes the conclusory assertion Defendant Smith's

recommendation is a "sham" statement.   Doc. 178 at 30.   Plaintiff states in his declaration

Defendants knew how these procedures should be applied because "[t]he procedure is one of the

most commonly used."   Id. at 3, 5–6, 29.   Plaintiff argues Defendants Toole, Smith, and

Fountain implemented "a practice to deny religious exercise."   Id.   In support of these

assertions, Plaintiff first cites to a news article titled "Georgia DOC's Tier II Program, extreme

solitary confinement, is dehumanizing torture" written by Justin Sinclair Ashley.   Doc. 178-1 at

114–126.   The article states, among other things, prisoners at GSP are not given vegan meals

and "are not being transferred to prisons that serve vegan meals . . . ."   Id.   Mr. Ashley does not

claim he was denied vegan meals and does not appear to have personal knowledge of any other

denials.   Second, Plaintiff produces a complaint filed in the District Court for the Middle

District of Georgia by another GSP inmate against Defendant Toole and the GSP Food Service

Supervisor.   Doc. 178-1 at 127–30.   This document and Plaintiff's briefing do not provide any

details surrounding this other lawsuit.   Id.

Plaintiff's declaration alone does not create a genuine dispute because he cannot

personally speak to Defendant Smith's state of mind when he made the recommendation.

Plaintiff does not state any other prisoners were denied religious meals.   The additional two

pieces of evidence Plaintiff cites are also insufficient to create a genuine dispute as to whether a

de facto policy existed, as discussed in Mbonyunkiza, 956 F.3d 1048 at 1055.   The evidence

Plaintiff cites does not create a genuine dispute as to whether Defendant Smith individually

implemented such a de facto policy, as he is not mentioned in either document.   The evidence

provided by Plaintiff also does not rise to the level of creating an inference of intentional conduct

on the part of Defendant Smith, as it is merely consistent with the evidence in this case that

Smith was, at most, negligent in denying Plaintiff's grievance.   Lovelace, 472 F.3d at 195–96,

201–202.

For these reasons, a genuine dispute does not remain as to a First Amendment violation

by Defendant Smith, and summary judgment should be granted.

### 3.      *Defendant Toole.*

As noted above, Defendant Smith recommended Defendant Toole deny Grievance Number 173334.   Doc. 25-4 at 12; Doc. 145-13 at 2–3; Doc. 145-19 at 5–6.   Defendant Toole denied Plaintiff's grievance on July 21, 2014.   Doc. 25-4 at 11; Doc. 145-19 at 5–6.   In support of their argument Defendant Toole was at most negligent, Defendants point to the text of Defendant's Toole's grievance denial and his affidavit.   Doc. 149-15 at 16; Doc. 182 at 10.   In the denial, Defendant Toole reiterated Defendant Smith's findings, noting "Georgia State Prison does not offer [v]egan meals" and Plaintiff would "remain at Georgia State Prison . . . for twelve months with [the] last six months" free of disciplinary issues before "he may transfer to an institution that offers a [v]egan diet."   Doc. 25-4 at 11; Doc. 145-19 at 5–6.   Like Smith, Defendant Toole concedes he misapplied the policies because the Inter-Institutional Transfer Policy does not typically apply to inmates on a Restricted Vegan Meal Plan.   Doc. 145-2 at 5. Defendant Toole states he misunderstood how the policies "worked together."   Id.

In response, Plaintiff makes similar assertions that Defendant Toole knew about these policies because they were commonly used and that Defendant Toole participated in a practice of denying vegan meals to inmates.   Id. at 3, 5–6, 29.   These conclusory statements in Plaintiff's declaration and the two pieces of evidence cited in support of them are insufficient to create a genuine dispute for the same reasons already discussed.   Plaintiff also claims Defendant Toole, along with Defendant Upton, wrongfully transferred him to GSP.   Doc. 178 at 18.   However, Plaintiff produces no evidence showing Defendant Toole transferred him to GSP.   In exhibits attached to Plaintiff's Response to Defendants' Motion for Summary Judgment, a document entitled "Assignment Detail" specifies "Linder, Vanessa Yvette" approved the transfer "Per Betty-Dean Bailey."   Doc. 178-1 at 7.   Nothing in the record shows Defendant Toole

participated in the decision to transfer Plaintiff to GSP, much less orchestrated that transfer. The record only shows Defendant Toole approved Plaintiff's placement in Tier II after he had already been transferred.   Doc. 145-2 at 8.

In his Complaint, Plaintiff claims he wrote to Defendant Toole, the warden of GSP at the time, to explain he needed a vegan diet, but he received no response.   Doc. 1 at 10.   Plaintiff does not mention this letter in his summary judgment briefing, but he has submitted several letters he appears to have sent to Defendant Toole, some of which are unrelated to this case. Doc. 178-1 at 15, 41, 56–58, 61–62.   Although these letters sometimes mention Plaintiff's diet, they would not have put Defendant Toole on notice the Institutional-Transfer Policy did not apply.   Because the letters do not address the central reason for Defendant Toole's negligent mistake, they are insufficient to create a genuine dispute of material fact as to Defendant Toole's state of mind.   Plaintiff also alleges in his Complaint he spoke with Defendant Toole about his diet in person during an inspection, but Plaintiff has not produced any evidence at this stage demonstrating such a conversation occurred.   Doc. 1 at 12–13.

Plaintiff's claim against Defendant Toole is distinguishable from his claim against Defendant Smith in that Plaintiff alleges he informed Defendant Toole of his diet on various occasions.   However, Plaintiff has failed to offer any evidence showing either a de facto policy or an inference of intentional conduct.   Plaintiff has not produced any evidence to contradict Defendant Toole's assertion he negligently misunderstood the Inter-Institutional Transfer Policy's application.

### 4.   *Defendant Fountain.*

Plaintiff appealed the denial of Grievance Number 173334, and Defendant Fountain denied that appeal on August 26, 2014.   Doc. 25-4 at 15.   Defendants argue Defendant Fountain

acted negligently at most and point to the text of her appeal denial and her affidavit as evidence. Doc. 145-19 at 16.   As with Defendants Smith and Toole, Defendants argue Defendant Fountain based her denial on her own understanding of SOP IIC05-0001.   Doc. 145-8 at 2–3.   Defendant Fountain stated in the appeal denial "Georgia State Prison does not offer [v]egan meals" and "[a]ccording to SOP IIC05-0001, [Plaintiff] must remain at Georgia State Prison for [12] months with the last [6] months being disciplinary free before [he] will be eligible to submit a transfer to an institution that offers" vegan meals.   Doc. 25-4 at 15; Doc. 145-19 at 5–6.   In her affidavit, Defendant Fountain states she "did not intentionally deny Shaw a vegan diet" because she "mistakenly informed [Plaintiff] that . . . the Inter-Institutional Transfer policy was applicable to his complaints."   Doc. 145-8 at 3.

Plaintiff has not produced any evidence suggesting Defendant Fountain acted intentionally to create a genuine dispute.   Plaintiff again claims Defendant Fountain did not merely make a mistake because this is a commonly used policy.   Doc. 178 at 5–6, 29.   This conclusory allegation and the two pieces of evidence cited in support of it are not enough to create a genuine dispute of material fact for the same reasons already discussed.   Plaintiff has only submitted evidence showing Defendant Fountain denied his grievance appeal and does not show Defendant Fountain took any other actions to deny him of his diet.   The mere denial of a grievance "without person[al] participat[ion] in the unconstitutional conduct brought to light by the grievance, is insufficient to establish § 1983 liability."   Adkinson, 2020 WL 982007, at *5. Thus, Plaintiff's First Amendment free exercise claim against Defendant Fountain fails.

### 5.   *Defendant Paul.*

Defendant Paul served as the Deputy Warden of Care and Treatment at GSP.   Doc. 147-2 at 1.   As part of his duties, Defendant Paul "served as the facility designee who received and forwarded inmates' requests to participate in the Alternative Meal Program."   Id. at 1–4.

Defendants initially argue Defendant Paul is entitled to summary judgment because he could not have been aware of Plaintiff's diet when Plaintiff never completed a Participation Form at GSP. Doc. 145-19 at 16.   In his declaration, Defendant Paul states, if Plaintiff had submitted a Participation Form while at GSP in 2014, the form "would have brought the issue to [his] attention and allowed [him] to address [Plaintiff's] complaints."   Doc. 147-2 at 4.   Because GSP could not accommodate restrictive vegan diets, Defendant Paul "would have forwarded his request to the FOM and the Chaplain for further handling."   Id. at 4.   Defendant Paul asserts he did not intentionally deny Plaintiff a vegan diet.   Id. at 5.

In his response, Plaintiff recognizes he did not submit a Participation Form but states he informed Defendant Paul about his religiously required diet during a cell inspection, and Defendant Paul told Plaintiff to eat around the animal product.   Doc. 178 at 4.   In his declaration, Defendant Paul claims he never told Plaintiff to eat around his tray, but he does not necessarily deny he was aware of Plaintiff's diet.   Doc. 147-2 at 4.   Defendant Paul contends he would have directed Plaintiff to submit a Participation Form if Plaintiff requested a vegan diet. Id. at 5.

Plaintiff also alleges in April 2014, John Berry—a friend of Plaintiff's who is not incarcerated—called Defendant Paul regarding Plaintiff's vegan diet.   Doc. 178 at 4.   Plaintiff submitted an affidavit signed by Mr. Berry detailing the call between Mr. Berry and Defendant Paul.   Doc. 178-1 at 98.   Mr. Berry states he tried to inform Defendant Paul of Plaintiff's religious diet, but Defendant Paul said GSP does not offer a vegan meal plan and Plaintiff would have to "eat around" what Plaintiff did not want.   Id.   Mr. Berry also states Defendant Paul said he could not discuss the matter further because "he had more important things to do."   Id.

Even construing the facts in the light most favorable to Plaintiff—namely, facts related Defendant Paul's discussions with Plaintiff and Mr. Berry—Plaintiff has still failed to establish a genuine dispute of material fact.   Although a closer call than Defendants Smith, Toole, and Fountain, these discussions only show a misunderstanding and misapplication of the prison policies on Defendant Paul's part.   Although the parties dispute whether Defendant Paul directed Plaintiff to eat around his tray, even if assumed to be true, Defendant Paul's actions do not rise to the level of creating an inference intentional conduct.   See Lovelace, 472 F.3d at 195–96, 201–202.   In Lovelace, the court noted the special facts present, which qualified for an exception to the general rule a prison official cannot be held liable under § 1983 for a negligent failure to accommodate religious beliefs.   Id. at 195–96.   Unlike Lovelace, special facts suggesting Defendant Paul acted intentionally are not present in this case assuming these conversations occurred.   Defendant Paul believed a Participation Form was necessary even though Plaintiff had already been approved for a vegan diet.   Doc. 145-10 at 5.   Thus, Defendant Paul would not have necessarily known directing Plaintiff to eat around his tray was incorrect without Plaintiff ever submitting a Participation Form.   Plaintiff has produced no evidence suggesting Defendant Paul intentionally interfered with his free exercise right to create a genuine dispute.   Thus, Plaintiff's First Amendment claim against Defendant Paul should fail.

### 6.     *Defendant Brewton.*

Defendant Brewton asserts she did not deny Plaintiff of his vegan diet at all— intentionally or otherwise.   Doc. 145-12 at 2.   In her affidavit, Defendant Brewton states she did not have the authority to grant or initiate transfers as Unit Manager or Deputy Warden.   Id. Defendant Brewton states inmates moved to a non-vegan facility for security reasons are required to "resubmit a request . . . in accordance with GDC SOP IVL01-0027."   Id.   It is

undisputed that when Plaintiff "raised his concerns regarding a restrictive vegan diet to [Defendant Brewton], she advised him to submit a request for a restrictive vegan diet in accordance with GDC SOP IVL01-0027."   Id. at 3; see Doc. 178 at 4 (stating Plaintiff voiced his concerns about not receiving his religious diet to Defendant Brewton, and "she insisted [Plaintiff] still had to fill out a request").

Plaintiff alleges he sent a letter about the denial of his vegan diet to Defendant Brewton on March 16, 2014, and to Defendants Brewton and Toole on March 27, 2014.   Doc. 160 at 3; Doc. 178-1 at 12, 15, 18.   These letters are insufficient to create a genuine dispute of material fact as to whether Defendant Brewton acted intentionally.   The first letter may show Defendant Brewton was aware of Plaintiff's diet, but Plaintiff does not dispute Defendant Brewton responded to his complaints by directing him to complete a Participation Form.   This letter alone does not suggest Defendant Brewton acted intentionally.   Plaintiff has not submitted a letter to Defendant Brewton dated March 27, 2014.   A letter with this date appears to have been sent to GSP Counselor Ogden, who is not a party to this case.   Doc. 178-1 at 18.   Plaintiff has also submitted a letter dated March 24, 2014, apparently sent to Defendant Brewton that only discusses retaliation, not Plaintiff's diet.   Id. at 15.

Plaintiff also asserts he was not required to complete another Participation Form even though Defendant Brewton advised him to do so because he was already approved.   Doc. 178 at 30.   Plaintiff argues requiring him to complete a second form substantially burdens his religion even if the policy does require pre-approved inmates to submit the form again.   Id. at 29.   A "substantial burden" is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior . . . ."   Thai Meditation, 980 F.3d at 831 (quoting Midrash, 366 F.3d 1214).   The Eleventh Circuit has further explained a substantial burden must amount to

more than a mere inconvenience; it is significant government pressure that forces someone to modify their religious behavior.   Id.   Plaintiff has not explained how completing a Participation Form is contrary to his religious beliefs or would somehow modify his religious behavior in any significant way.

Defendants assert Defendant Brewton's advice to Plaintiff afforded him a "reasonable opportunity" to practice his religious beliefs.   Doc. 182 at 9.   Defendants appear to argue all Defendants are entitled to summary judgment solely for this reason.   Id. at 10–11.   Because the record does not show when Defendant Brewton advised Plaintiff of this opportunity during the course of his several months of incarceration, the Court declines to grant summary judgment for this reason alone.   However, Defendant Brewton is entitled to summary judgment because Plaintiff has failed to produce any evidence suggesting Brewton intentionally denied him of his diet.   Thus, Plaintiff's First Amendment free exercise claim against Defendant Brewton fails.

### 7.    *Defendant Steve Upton.*

Defendants initially argued Defendant Upton is entitled to summary judgment because Plaintiff's diet was never brought to his attention.   Doc. 145-19 at 16.   Defendant Upton was a Field Operations Manager, overseeing several GDC facilities including GSP, from January 1, 2010, until July 1, 2014.   Doc. 145-7 at 1.   In this role, Defendant Upton was responsible for reviewing requests made by prisoners under SOP IVL01-0027 to participate in the Alternative Meal Program where a facility housing the requesting prisoner was unable to provide a vegan or restrictive vegan meal.   Id. at 3.   Once promoted to Deputy Director of Facilities, Defendant Upton did not process requests for vegan meals.   Doc. 145-7 at 3.   It is undisputed Plaintiff did not submit a Participation Form while housed at GSP.   Id.; Doc. 178 at 19.

In response, Plaintiff asserts Mr. Berry called Defendant Upton regarding Plaintiff's vegan diet in March or April 2014.   Doc. 178 at 4.   Plaintiff states Defendant Upton told Mr.

Berry, "[Plaintiff] wanted out of the Hi Max [sic] [so] he need[ed] to get off vegan."   Id.
Plaintiff supports this assertion by citing to the affidavit of John Berry, which recounts this
exchange.   Id.; 178-1 at 98.   While this conversation may demonstrate Defendant Upton knew
about Plaintiff's diet, it is insufficient to create a genuine dispute as to whether Defendant Upton
acted intentionally because Plaintiff has not produced any evidence of a single action taken by
Defendant Upton to deny Plaintiff of his diet.

   Plaintiff asserts Defendant Upton must have known of his vegan diet because he would
have seen his active profile as the FOM when Plaintiff was transferred to GSP.   Doc. 178 at 1,
36.   Plaintiff further asserts Defendant Upton orchestrated his transfer to GSP, despite knowing
GSP could not accommodate his vegan diet.   Doc. 178 at 18, 28, 30, 36.   However, these
assertions are insufficient to create a genuine dispute of material fact.   The record, even viewed
in the light most favorable to Plaintiff, does not show Defendant Upton had any involvement
with Plaintiff's transfer to GSP.   Defendant Upton states he was not generally involved in
inmate transfers but was only consulted for approval of transfers when Rick Jacobs, the then
Director of Facilities, was unavailable.   Doc. 145-12 at 3.   Defendants argue Plaintiff's transfer
to GSP was initiated by officials at the GDC's Central Office who selected Plaintiff as a
candidate for GSP's new Tier II program.   Doc. 182 at 8.   Defendants offer the affidavit of
Defendant Toole, who states Plaintiff was indeed transferred to GSP by the GDC's Central
Office to participate in GSP's Tier II program.   Doc. 145-2 at 8.   As discussed previously, the
"Assignment Detail" document Plaintiff has produced only shows "Linder, Vanessa Yvette" and
Betty-Dean Bailey as responsible for Plaintiff's transfer.   Doc. 178-1 at 7.   This document
demonstrates Defendant Upton was not involved in Plaintiff's transfer to GSP.

Plaintiff further argues Defendant Upton must have been aware of his diet because of his previous transfer to GSP in 2010.   Doc. 178 at 3.   While Plaintiff's previous denial of his diet may show some knowledge by Defendant Upton, this still does not create a genuine dispute as to whether Defendant Upton intentionally deprived Plaintiff of his diet in 2014.

Additionally, § 1983 requires proof of an affirmative causal connection between an official's acts or omissions and the alleged constitutional violation.   Zalter v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).   In the supervisory context, a plaintiff "must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."   Keith v. DeKalb County, 749 F.3d 1034, 1047–48 (11th Cir. 2014).   Plaintiff has not offered any evidence Defendant Upton—rather than the GDC's Central Office—caused his transfer.   Thus, Defendant Upton cannot be held liable for any violations of Plaintiff's First Amendment rights caused by Plaintiff's transfer, which was ordered by officials not party to this case.   Doc. 178-1 at 7.

Plaintiff has not pointed to any evidence of any specific actions taken by Defendant Upton to deny Plaintiff his diet.   Therefore, Plaintiff has failed to demonstrate a causal connection between Defendant Upton's actions and the denial of his constitutional rights. Zalter, 802 F.2d at 401.   Accordingly, Defendant Upton cannot be held liable for violating Plaintiff's First Amendment rights.

Plaintiff has not pointed to any evidence demonstrating Defendants were more than negligent in failing to accommodate Plaintiff's diet.   Additionally, Plaintiff has not presented sufficient evidence to create a genuine dispute regarding a de facto policy or an inference of intentional conduct.   For these reasons, I **RECOMMEND** the Court **GRANT** summary

judgment in Defendants' favor on Plaintiff's free exercise claim.   Having recommended the

entry of summary judgment in Defendants' favor on these grounds, the Court declines to address

Defendants' argument Plaintiff's injuries are de minimis.

## III.   Plaintiff's Retaliation Claims

Plaintiff makes numerous allegations of retaliation against all Defendants in his original

Complaint.   Doc. 1.   However, the Court granted Defendants' motion to dismiss many of

Plaintiff's retaliation claims due to Plaintiff's failure to exhaust his administrative remedies.

Doc. 60 at 20–23; Doc. 62 at 2.   The only remaining retaliation claims are Plaintiff's "claims

that Defendants Upton and Toole retaliated against Plaintiff by placing him on long-term

disciplinary segregation."[12]   Doc. 62 at 2.   The Court liberally construes Plaintiff's claims as

including both his initial assignment to segregation at GSP and his later assignment to Tier II.

As explained in more detail below, Plaintiff has failed to identify any evidence from which a

reasonable jury could infer Defendants Toole and Upton retaliated against him for filing

grievances or prior lawsuits.   Therefore, the Court should grant Defendants' Motion for

Summary Judgment as to Plaintiff's remaining retaliation claims.

### A.   Facts Relevant to Plaintiff's Retaliation Claims

Plaintiff states Defendants Upton and Toole placed him in segregated confinement as

retaliation for his March 2014 grievances and his then-pending lawsuit.   Doc. 1 at 17; Doc. 178

at 24–25.   At the time of Plaintiff's transfer to GSP on March 13, 2014, the Tier II program was

not yet implemented and would not begin until July 2014.   Doc. 145-2 at 6.   Prior to his

transfer, Plaintiff was incarcerated in the SMU at GDCP.   Id. at 2.   Defendant Toole states in

---

[12]       Importantly, Plaintiff's current claims do not include his transfer from GDCP to GSP.   Even if
such a claim were still pending before the Court, Defendants would be entitled to summary judgment.
The record does not show these Defendants were involved with Plaintiff's transfer from GDCP to GSP in
any way.

his affidavit Plaintiff was transferred from the SMU at GDCP to GSP for the purpose of his participating in the Tier II program once implemented.   Id.

Defendant Toole states the GDC's Central Office selected Plaintiff as an appropriate candidate for the soon-to-be-implemented Tier II program at GSP.   Id. at 8.   A document produced by Plaintiff entitled "Assignment Detail" supports Defendant Toole's statement the decision to transfer Plaintiff to GSP was made by the GDC's Central Office.   Doc. 178-1 at 7. This document indicates the reason for Plaintiff's reassignment as "population redistribution." Doc. 178-1 at 7.

The Tier II program was established at GSP in July 2014, with SOP IIB09-0003 governing the Tier II program, including assignment, review, and the appeals process. Doc. 145-2 at 6.   According to SOP IIB09-0003, a "Classification Committee" reviews an inmate's placement in Tier II and then submits a recommendation for approval or disapproval by a warden.   Doc. 145-6 at 5.   SOP IIB09-0003 also dictates an inmate must meet at least one of thirteen criteria to be placed into Tier II.   Id.

**B.   Legal Standard**

To prove a retaliation claim under the First Amendment, an inmate needs to show (1) his speech or act was constitutionally protected, (2) he suffered an adverse action from prison officials that would deter a person of ordinary firmness from engaging in such speech or act, and (3) the protected speech or conduct and adverse action were causally connected.   Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008).   Defendants argue there is no causal connection between Plaintiff's protected speech and his assignment to segregation, and the record shows Plaintiff's assignment to segregation did not chill his speech.   Doc. 145-19 at 22–23.

32

To establish the causation element, "the plaintiff must show that the defendant was 'subjectively motivated to discipline' the plaintiff for exercising his First Amendment rights." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Mosley 532 F.3d at 1278).   To establish a causal connection, Plaintiff must present evidence of "retaliatory animus" on the part of the Defendants.   O'Bryant v. Finch, 637 F.3d 1207, 1219 (11th Cir. 2011).   However, Plaintiff producing evidence showing his protected speech was a motivating factor behind any harm does not end the inquiry.   If Plaintiff produces such evidence, the burden then shifts to Defendants.   Mosley, 532 F.3d at 1278 (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999)).   If Defendants show they would have taken the same action absent the protected activity, they are entitled to summary judgment in their favor.   Id. (citation omitted).

**C.    Analysis**

Upon Plaintiff's transfer to GSP, Defendant Toole states Plaintiff "was placed in administrative segregation because the Tier II Program had not been implemented yet and because it was not appropriate to place [Plaintiff] in the general population immediately after leaving the SMU."   Doc. 145-2 at 3.   It is unclear from this statement whether Defendant Toole or someone else initially placed Plaintiff in non-Tier II administrative segregation.   Id.

Defendant Toole admits he later approved Plaintiff's assignment to Tier II but maintains his approval was not related to Plaintiff's grievances or lawsuit.   Id. at 2.   Defendant Toole asserts he approved Plaintiff's assignment to Tier II due to the Classification Committee's recommendation.   Id.   SOP IIB09-0003 lists "Transfer from GDCP SMU" as one of the criteria for Tier II placement.   Doc. 145-6 at 6.   On July 16, 2014, the Classification Committee held a hearing for Plaintiff and recommended placement in the Tier II Program.   Doc. 145-2 at 8; Doc. 145-3 at 7.   Institutional records Defendants submitted indicate the Classification

Committee noted Plaintiff had not received a disciplinary infraction in over a year.   Doc. 145-3 at 7.   However, these documents also note Plaintiff was transferred from GDCP to GSP to participate in the Tier II Program and show the Classification Committee recommended Plaintiff's placement in the Tier II Program "for the safe and orderly operation of [GSP]."   Id. Defendant Toole states he approved the Classification Committee's July 16, 2014 recommendation because Plaintiff was transferred from the SMU at GDCP and his institutional records supported the Committee's note that Plaintiff presented a threat to the safety and security of GSP.   Doc. 145-2 at 8.   Defendant Toole also states he could not have retaliated against Plaintiff because the GDC Central Office already selected Plaintiff as a candidate for Tier II prior to the filing of his grievances and previous lawsuit.   Id. at 8.   In contrast, Defendant Upton argues he cannot be held liable because he was not involved in Plaintiff's transfer to GSP, in recommending inmates for Tier II generally, or in Plaintiff's initial assignment to segregation or Tier II or any subsequent review of that assignment.   Doc. 145-19 at 22; Doc. 145-7 at 2.

Plaintiff points to evidence he contends shows Defendants Toole and Upton had retaliatory intent.   Doc. 178 at 16–17.   First, Plaintiff points to GDC records and argues these records contradict Defendants' claim he was transferred to GSP to participate in the Tier II program.   Id.; Doc. 178-1 at 1, 7.   Plaintiff highlights that the documents detailing his transfer to GSP offer "population redistribution" as the reason for transfer, while the documents detailing his transfer out of GSP offer "Tier II Phase I" as the reason for transfer.   Compare Doc. 145-3 at 9 (showing "Tier II Phase I" as the "approved assignment reason" for Plaintiff's November 10, 2014 transfer to VSP from GSP), with Doc. 145-3 at 2 (showing "population redistribution" as the "approved assignment reason" for Plaintiff's March 11, 2014 transfer to GSP from GDCP); Doc. 152-6 at 2; Doc. 159 at 3; Doc. 160 at 1–5.   Plaintiff also points out the "Assignment

Detail" document lists him as "general population," yet he was placed in administrative segregation upon arrival at GSP.   Doc. 178 at 15; Doc. 178-1 at 7.

Plaintiff has failed to point to any evidence demonstrating retaliatory intent by Defendants Toole and Upton or even direct involvement by these Defendants in Plaintiff's assignment to segregation and Tier II at GSP.   Plaintiff points to a few innocuous inconsistencies in the assignment and transfer records related to Plaintiff's status and the reasons for reassignments (e.g., identifying Plaintiff as "general population," while Plaintiff was placed in administrative segregation), but those inconsistencies do not demonstrate retaliatory intent on the part of these Defendants.   Indeed, the documents show Defendants were not involved in Plaintiff's transfer to GSP at all.   Doc. 178-1 at 1, 7; Doc. 145-3 at 2.   Even if the evidence did show involvement by these Defendants in the transfer, Plaintiff's transfer to GSP is not part of Plaintiff's remaining retaliation claim.   Moreover, at the time of his transfer to GSP, Plaintiff had not even filed the grievances or <u>Shaw I</u> lawsuit.[13]   Nothing in these records demonstrates Defendants Toole or Upton placed Plaintiff in administrative segregation or Tier II in order to retaliate against Plaintiff for exercising his First Amendment rights.

Plaintiff also relies on a copy of SOP IIB09-0001.   Doc. 178-1 at 204.   Plaintiff argues this policy mandates prison officials follow certain procedures when placing someone in administrative segregation, which officials did not follow when they originally placed him in administrative segregation at GSP.   Doc. 178 at 15.   In addition, Plaintiff argues Defendants fabricated the reasons for his placement in administrative segregation upon arrival at GSP, and this fabrication is evidenced by prison log books.   Doc. 178 at 15.   Plaintiff refers to a series of

---

[13]    Later in his Response, Plaintiff asserts Defendants Toole and Upton assigned him to Tier II in retaliation for a previous lawsuit filed in the Middle District of Georgia, <u>Shaw v. Hall</u>.   Plaintiff does not cite any evidence supporting this conclusory statement other than his own Complaint.   Doc. 178 at 29, 43.

documents titled "Segregation/ Isolation Checklist–12 Hour Shift."   Doc. 178-1 at 25–40.

These documents appear to be internal prison records generated from prison guards periodically

checking on inmates in administrative segregation.   Id.   The first document in this series is

dated March 13, 2014, and gives "transferred from GDCP" as the reason for Plaintiff's

assignment to administrative segregation.   Id. at 21.   The next three documents in the series,

dated from March 16, 2014 to April 5, 2014, give "close security" as the reason for Plaintiff's

assignment.   Id. at 22–24.   The remaining documents—dating from April 6, 2014 to July 20,

2014—give Plaintiff's reason for assignment as "[i]nvolved in provoking a disturbance at Smith

State Prison on [June 1, 2011]."   Id. at 25–40.   Plaintiff reasons officials were unjustified in

placing him in segregated confinement because he was never involved in an incident at Smith

State Prison.   Doc. 178 at 15.   The evidence in the record confirms Plaintiff was not at Smith

State Prison on June 1, 2011, or at any other point.[14]

Plaintiff's citation to SOP IIB09-0001 does not create a genuine dispute as to Plaintiff's

retaliation claim.   There is no indication prison officials even violated this policy, as Plaintiff

was in the SMU at GDCP prior to transfer.[15]   Even if the policy were violated, Plaintiff has not

shown Defendants Toole or Upton violated the policy or that any violation was in response to

---

[14]      A copy of Plaintiff's grievance history indicates he filed a grievance on June 1, 2011, from
GDCP.   Doc. 178-1 at 13.   In Defendant Brewton's responses to Plaintiff's interrogatories, she states
Plaintiff has never been incarcerated at Smith State Prison.   Id. at 178.   In Defendant Smith's answers to
Plaintiff's second set of interrogatories, Defendant Smith says he is "unaware of any documents showing
Plaintiff's involvement in a disturbance at Smith State Prison on [June 1, 2011]."   Id. at 168.

[15]      Defendant Toole asserts, "The SMU was the most restrictive form of administrative segregation
at the GDC at that time."   Doc. 145-2 at 2.   Plaintiff argues Tier II was more restrictive than the SMU.
Doc. 178 at 13–14, 43.   However, Plaintiff does not dispute he was housed in high maximum security at
the SMU.   Id. at 13 ("I was housed in the HIMAX/SMU . . . .").   Thus, he does not appear to dispute he
was already assigned to administrative segregation prior to being transferred to GSP.   Id.   The policy
may not have been violated because many of the procedures appear to apply only to initially placing an
inmate in administrative segregation.   Doc. 178-1 at 204.

Plaintiff exercising his First Amendment rights.   Viewing the evidence in the light most favorable to Plaintiff, certain portions of the log books give incorrect or inconsistent reasons for Plaintiff's assignment to administrative segregation.   But the records do not show Defendants Toole or Upton placed Plaintiff in administrative segregation or that they did so in retaliation for Plaintiff's exercise of his constitutional rights.   These log books do not suggest any retaliatory intent by Defendants Toole and Upton, and they do not suggest any causal connection between Plaintiff's protected speech and his placement in administrative segregation and later Tier II. Although each signature is not entirely legible, there is nothing to suggest Defendants Toole or Upton had any role in incorrectly stating Plaintiff's reason for assignment in these log books. Further, Plaintiff fails to explain how the incorrect notations in the log books contradict Defendants' explanation of Plaintiff's transfer and assignments.   Although Plaintiff correctly points out the inconsistencies, the handful of annotations—among the many pages of documents in the record—do not suggest any nefarious intent.

Finally, Plaintiff produces his Tier II appeal form and Mr. Berry's affidavit.   Doc. 178-1 at 95–99; Doc. 160-2 at 1–5; Doc. 160-4 at 1–2; Doc. 152-4 at 2–4.   This evidence fails to show retaliatory intent or a causal connection.   Plaintiff's Tier II appeal form shows only that Plaintiff disputed his assignment to Tier II and claimed retaliation.   Doc. 160-4 at 1–2.   Mr. Berry's affidavit does not provide any additional support for Plaintiff's claim.   Mr. Berry fails to mention Defendant Toole anywhere in his affidavit.   Doc. 178-1 at 95–99.   Many of Mr. Berry's assertions are entirely conclusory.   For example, Mr. Berry states, "[Defendant] Upton transferred [Plaintiff] to the high max unit in Jackson[,Georgia,] as retaliation for his filing grievances."   Id. at 97.   Mr. Berry states Defendant Upton told him, "[Plaintiff] wanted out of the high max so he needed to get off vegan."   Doc. 178-1 at 98.   But Mr. Berry does not allege

Defendant Upton personally participated in Plaintiff's 2014 transfer.   Even if he did, Plaintiff's 2014 transfer is not the retaliatory act at issue.   Plaintiff's placement in administrative segregation upon transfer to GSP and his July 2014 placement in the Tier II program are the alleged retaliatory acts underlying Plaintiff's claims, and Mr. Berry is silent on those issues.

Plaintiff asserts Defendant Toole and Upton "were evil motivated [sic]" and committed "malicious retaliation."   Doc. 178 at 44.   However, the evidence Plaintiff points to fails to connect his placement in administrative segregation or Tier II with his protected speech and fails to show Defendants Upton and Toole had any retaliatory intent.   Absent any evidence, Plaintiff's retaliation claim rests entirely upon his own conclusory allegations, which are insufficient to show a causal connection or retaliatory intent.   See Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (affirming summary judgment for the defendant because the plaintiff "produced nothing, beyond his own conclusory allegations, suggesting that [the defendant's] actions in compliance with the strip search regulations were motivated by retaliatory animus").

Even if Plaintiff had provided evidence establishing his protected conduct were a motivating factor behind his placement in administrative segregation and Tier II at GSP, Defendants Upton and Toole would still be entitled to summary judgment on Plaintiff's retaliation claim.   If Plaintiff produced evidence showing Defendants were motivated by Plaintiff's protected speech, the burden would then shift to Defendants.   Mosley, 532 F.3d at 1278.   If Defendants could show they would have taken the disciplinary action in the absence of Plaintiff's protected conduct, they cannot be held liable.   Id. at 1278 n.22; see also O'Bryant, 637 F.3d at 1219–20.   Defendants argue, and have produced evidence, that Plaintiff would have been placed in administrative segregation and Tier II regardless of any lawsuits or grievances he may have filed.   Doc. 145-19 at 22.

38

Defendant Toole states Plaintiff was already in administrative segregation at the SMU prior to his transfer.   Doc. 145-2 at 2.   Thus, he continued in non-Tier II administrative segregation at GSP after his transfer "because it was not appropriate to place [Plaintiff] in the general population immediately after leaving the SMU."   Id. at 3.   Defendants argue Plaintiff's later placement in Tier II—a short time after the transfer from GDCP to GSP—was also based upon Plaintiff's assignment in the SMU and his threat to the safety and security of GSP. Doc. 145-19 at 22.   Defendant Toole states in his affidavit inmates who leave the SMU are generally placed in the Tier II program so prison officials can monitor the inmate and ensure he is able to cohabitate with a roommate.   Doc. 145-2 at 3.   Defendant Toole states he approved Plaintiff's placement in Tier II because Plaintiff was transferring out of the SMU.   Id. at 8. Indeed, SOP IIB09-0003 lists transfer from GDCP SMU as one of 13 criteria for admission to Tier II, doc. 145-6 at 5–6, and the Classification Committee also recommended Plaintiff for Tier II prior to Defendant Toole's approval.[16]   Doc. 145-3 at 5, 8.   Assuming Plaintiff could establish a causal connection, Defendants could still show they would have taken the same course of action regardless of Plaintiff's protected activity.[17]   O'Bryant, 637 F.3d at 1219–20.

---

[16]      In addition to transfer out of SMU, an inmate may be eligible for Tier II under SOP IIB09-0003 if he is "noted as a threat to the safe and secure operation of the facility."   Doc. 145-6 at 5–6.   Defendant Toole states he approved Plaintiff's assignment because Plaintiff transferred from the SMU.   Doc. 145-2 at 8.   However, Defendant Toole also states Plaintiff's institutional records supported the Classification Committee's note that Plaintiff was a threat to the safety and security of GSP.   Id.   Although it is unclear what institutional records Defendant Toole is referring to, the "Case Notes History Details" Defendants produced identify Plaintiff as being a "sexual aggressor" and indicate Plaintiff was convicted of, among other things, rape, aggravated sodomy, and armed robbery.   Doc. 145-3 at 7.   This information was available to Defendant Toole when he approved the Classification Committee's recommendation and indicates Plaintiff met more than one criterion for Tier II eligibility.

[17]      In his Complaint, Plaintiff summarizes a conversation he had with Defendant Toole in his cell where Defendant Toole stated Plaintiff was filing a lot of paperwork.   Doc. 1 at 16.   Plaintiff does not discuss this in his summary judgment briefing.   Even if he did, this would be insufficient to create a genuine dispute of material fact because Defendant Toole could still show he would have taken the disciplinary action absent the protected conduct.

In sum, Plaintiff has failed to produce any evidence that any adverse action by Defendants Toole and Upton was causally connected to any of Plaintiff's protected speech. Mosley, 532 F.3d at 1276.   Rather, Plaintiff explains he was transferred from the SMU at GDCP, was placed in administrative segregation and Tier II at GSP, and speculates this must have been at Defendants Upton and Toole's behest and in retaliation for protected speech. Plaintiff offers only conjecture to support his theory.   The handful of administrative records containing a few innocuous inconsistencies do not support Plaintiff's theory or create a genuine dispute of material fact on these issues.   Moreover, Defendants have met their burden of showing Plaintiff would have been assigned to administrative segregation and Tier II regardless of any protected speech.   Accordingly, I **RECOMMEND** the Court **GRANT** this portion of Defendants' Motion for Summary Judgment.   Having recommended the entry of summary judgment in Defendants' favor on these grounds, the Court declines to address Defendants' argument Plaintiff's speech was not unconstitutionally chilled.

## IV.    Plaintiff's Access-to-Courts Claims

Plaintiff asserts access-to-courts claims against Defendants Smith, Toole, and Fountain. Doc. 60 at 27.   Plaintiff's claims against Defendants Smith and Toole relate to the alleged destruction of two grievances Plaintiff filed in March 2014.   Doc. 1 at 11–12.   Plaintiff argues the destruction of his March 2014 grievances hindered his pursuit of Shaw I, which this Court dismissed due to his failure to exhaust administrative remedies and caused him to forfeit his $350.00 filing fee.   Doc. 1 at 11–12; Doc. 178 at 9–10.   Plaintiff's claim against Defendant Fountain relates to a statewide grievance policy she created, which Plaintiff alleges was intentionally designed to allow prison officials to destroy inmate grievances without a paper trail. Doc. 1 at 22; Doc. 178 at 11–12.

### A.      Defendants Toole and Smith

Plaintiff alleges Defendants Toole and Smith destroyed his March 18 and 27, 2014 grievances.   Doc. 1 at 11–12; Doc. 178 at 9–10.   Defendants mainly argue Plaintiff's claim is barred by the doctrine of collateral estoppel because Plaintiff fully litigated the underlying and determinative factual issue—whether he properly filed his March 2014 grievances only to have Defendants subsequently destroy them—in Shaw I.   Doc. 145-19 at 19–20.   Defendants also argue there is no evidence supporting Plaintiff's access-to-court's claims.

#### 1.      Collateral estoppel.

Plaintiff first argues Defendants waived any collateral estoppel defense because they did not argue the defense in their motions to dismiss.[18]   Doc. 174; Doc. 175 at 5–6.   Defendants did file two motions to dismiss in this case and did not raise collateral estoppel in either.   Docs. 25, 45.   Federal Rule of Civil Procedure 12(h) specifies a party waives certain defenses by omitting them from a responsive pleading or motion to dismiss.   These defenses include: lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process.   Fed. R. Civ. P. 12(b).   Collateral estoppel is not one of the waivable defenses listed in Federal Rule of

---

[18]      Plaintiff filed a "Motion in Opposition to Defendants' Collateral Estoppel Defense."   Doc. 174. "Federal courts sometimes will ignore the legal label that a pro se litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category."   Retic v. United States, 215 F. App'x 962, 964 (11th Cir. 2007) (quoting Castro v. United States, 540 U.S. 375, 381 (2003)). Federal courts "may do so in order to avoid an unnecessary dismissal, to avoid inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a pro se motion's claim and its underlying legal basis."   Id. (quoting Castro, 540 U.S. at 381- 82) .   Here, Plaintiff's "Motion in Opposition to Defendants' Collateral Estoppel Defense" is a response to Defendants' collateral estoppel argument raised in Defendants' Motion for Summary Judgment. Therefore, the Court construes Plaintiff's filing, doc. 174, as a brief responding to Defendants' Motion for Summary Judgment.

Civil Procedure 12.   Thus, Defendants have not waived this defense for failing to raise it in their motions to dismiss as Plaintiff asserts.[19]

Because Defendants have not waived this defense, the Court proceeds to analyze the defense on the merits.   Collateral estoppel, also referred to as issue preclusion, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748–49 (2001)); I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986). The following elements must be true for issue preclusion to apply: "(1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior suit was a necessary part of the judgment in that action; and (4) the parties are the same or in privity with each other and the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." Grayson v. Warden, Comm'r, Ala. DOC, 869 F.3d 1204, 1223 (11th Cir. 2017) (quoting Baloco v. Drummond Co., 767 F.3d 1229, 1251 (11th Cir. 2014)).   Collateral estoppel generally applies within the federal courts when the factual issue "was properly raised by the pleadings or otherwise, submitted to the court for determination, and actually determined." Hamze v. Cummings, 652 F. App'x 876, 879 (11th Cir. 2016) (citing Christo v. Padgett, 223 F.3d 1324, 1339 (11th Cir. 2000)).

---

[19]     Plaintiff only claims Defendants waived the defense by not asserting it in the motions to dismiss, not that Defendants waived the defense by failing to specifically assert it in their answer.   Even if the Court were to liberally construe Plaintiff's brief to assert such an argument, Plaintiff has not demonstrated any prejudice, given that Defendants have asserted the defense in their Motion for Summary Judgment and Plaintiff has had a full opportunity to respond.   Edwards v. Fulton County, 509 F. App'x 882, 888 (11th Cir. 2013).   Additionally, a court may raise collateral estoppel issues sua sponte.   Martinez v. Mkt. Traders Inst., Inc., 757 F. App'x 815, 818 n.2 (11th Cir. 2018).

First, the factual issues at stake for Plaintiff's access-to-courts claim asserted against Defendants Toole and Smith mirrors those considered in <u>Shaw I</u>.   In <u>Shaw I</u>, Plaintiff brought claims regarding the denial of his religious diet against Defendants Toole and Smith along with Defendant Paul and the State of Georgia.   ECF No. 65 at 1–5.   In assessing Plaintiff's claims, the Court in <u>Shaw I</u> addressed the issue of whether Plaintiff had fully exhausted his administrative remedies as to those claims.   <u>Id.</u> at 9.   In doing so, the Court in <u>Shaw I</u> analyzed whether Plaintiff filed either of his alleged March 2014 grievances and whether the <u>Shaw I</u> defendants destroyed them.   <u>Id.</u>   In this case, Plaintiff's access-to-courts claims hinge on whether Defendants destroyed his March 2014 grievances.   While the posture may be different, an identical issue does exist: whether Plaintiff properly submitted either of the March 2014 grievances and, if so, whether Defendants Toole and Smith destroyed them.

Second, these issues were actually litigated in <u>Shaw I</u>.   In <u>Shaw I</u>, the Court dismissed Plaintiff's action because Plaintiff failed to exhaust his administrative remedies.   ECF No. 65 at 9–12; ECF No. 68 at 3–4.   The <u>Shaw I</u> defendants argued Plaintiff failed to file grievances concerning denial of vegan meals prior to filing suit.   In response, Plaintiff argued he submitted grievances on March 18 and 27, 2014, but these grievances were destroyed and not processed. <u>Shaw I</u>, ECF No. 65 at 9–10.   The Court analyzed Plaintiff's efforts at exhaustion prior to the date Plaintiff filed <u>Shaw I</u>.   <u>Id.</u>   The Magistrate Judge found a factual dispute existed as to the issue of exhaustion.   <u>Id.</u> at 9–12; <u>see also</u> <u>Turner v. Burnside</u>, 541 F.3d 1077, 1082–83 (11th Cir. 2008).   The Court then made factual findings as to whether Plaintiff filed the purported March 18 and 27, 2014 grievances and, if so, whether the grievances were destroyed.   <u>Shaw I</u>, ECF No. 65 at 9–12.   The Court ultimately found Plaintiff failed to exhaust his available administrative

remedies prior to filing <u>Shaw I</u>, Plaintiff had not actually filed the March 18, 2014 grievance, and the <u>Shaw I</u> defendants did not destroy Plaintiff's March 27, 2014 grievance.[20]   <u>Id.</u>

Third, the determinations that Plaintiff did not file March 2014 grievances and that Defendants Toole and Smith did not destroy them was a necessary part of the <u>Shaw I</u> judgment because Plaintiff would have otherwise exhausted his administrative remedies.   The Magistrate Judge found Plaintiff's March 18, 2014 grievance "was not actually filed" because Plaintiff improperly submitted it as an emergency grievance and, under SOP IIB05-0001, improper emergency grievances are returned to the inmate.   <u>Shaw I</u>, ECF No. 65 at 11–12.   The Court determined Plaintiff's allegation the defendants destroyed Plaintiff's March 27, 2014 grievance was not credible.   <u>Id.</u>   In making this determination, the Court examined evidence submitted, including Plaintiff's grievance history and the reference to the March 27, 2014 grievance in Grievance Number 173334.   <u>Id.</u>   Specifically, the Court found the evidence before it "belie[d] Plaintiff's version of events as to the grievance process and its availability to Plaintiff" regarding the March 27, 2014 grievance.   <u>Id.</u>   Based on these factual findings regarding the March 2014 grievances, the Magistrate Judge recommended the Court dismiss <u>Shaw I</u> because Plaintiff failed to exhaust his administrative remedies.   <u>Id.</u>

Plaintiff objected to the recommended dismissal.   <u>Shaw I</u>, ECF No. 66.   After a de novo review of the entire record, the District Judge determined Plaintiff's objections merely "reveal

---

[20]     Plaintiff submitted an additional grievance, Grievance Number 173334, on April 29, 2014 (concerning the alleged destruction of an earlier grievance), before filing <u>Shaw I</u> in federal court.   <u>Id.</u>, ECF No. 65 at 12 & n.5.   However, Plaintiff had not yet received the Central Office's final decision as to Grievance Number 173334 at the time he filed <u>Shaw I</u>.   <u>Id.</u>   Thus, in <u>Shaw I</u>, Grievance Number 173334 was insufficient to exhaust Plaintiff's remedies.   <u>Id.</u>   Plaintiff filed the instant action on January 19, 2016, after he received the Central Office's final denial of Grievance Number 173334.   <u>Id.</u>; Doc. 1. While the April 29, 2014 grievance was relevant to Plaintiff's exhaustion of administrative remedies in <u>Shaw I</u>, it has no significance here, where Plaintiff's access-to-court claims against Toole and Smith concern only the destruction of the purported March 2014 grievances.

his displeasure with the Magistrate Judge's conclusion as to the parties' factual dispute."   Shaw I, ECF No. 68 at 3–4.   The District Judge noted, "[T]he Magistrate Judge found Defendants' contentions to be supported by the record, whereas Plaintiff's version of events was contradicted by the record."   Id.   The District Judge also reviewed the "copy" of the March 27, 2014 grievance allegedly signed by Counselor Ogden and found that document was not enough to outweigh the evidence the Shaw I defendants submitted.[21]   Id.   Finally, the District Judge noted there was "no evidence before the Court" the March 27, 2014 grievance "was submitted to the Grievance Coordinator or that it was destroyed, as Plaintiff maintains."   Id.   Consequently, the Court overruled Plaintiff's objections, granted the Shaw I defendants' motion to dismiss, and dismissed the action without prejudice.   Id.

Fourth, the parties are the same.   Plaintiff was obviously a party to both Shaw I and this case.   Defendants Toole and Smith were two of the defendants in Shaw I.   Plaintiff claims he was denied a full and fair opportunity to litigate because (1) he was not provided with counsel, (2) he was not allowed to conduct discovery or present and cross-examine witnesses, and (3) the exhaustion analysis should not reach the merits of his claim.   Doc. 178 at 40; Doc. 175 4–5. Plaintiff cites no relevant authority holding counsel in a civil case or access to discovery at the motion to dismiss stage are required for collateral estoppel purposes.   Plaintiff has cited one case holding live witnesses are required to apply res judicata when a federal court considers a past administrative proceeding.   City of Pompano Beach v. FAA, 774 F.2d 1529, 1539 (11th Cir. 1985).   This case is distinguishable from the case Plaintiff cites because another federal court—this very Court—made the previous factual determination rather than an administrative agency.

---

[21]     The "copy" discussed was not an actual photocopy, but Plaintiff's own handwritten version of what he contends he submitted on a grievance form.   Shaw I, ECF No. 1-1 at 12.

Contrary to Plaintiff's argument, in <u>Shaw I</u>, Plaintiff had ample opportunity to submit briefing and evidence supporting his contentions he submitted March 2014 grievances and Defendants Toole and Smith destroyed them.   Plaintiff had a full and fair opportunity to litigate exhaustion by submitting briefing and evidence to the Magistrate Judge.   <u>See</u> Doc. 41 at 2 (generally requesting discovery); Doc. 63 at 2 (discussing a potential hearing on exhaustion without making a formal request); Doc. 66 at 2, 7, 9 (requesting a hearing on exhaustion and asking the Court to lift discovery stay); Doc. 54 (requesting counsel).   Plaintiff then had ample opportunity to dispute the issue again when he objected to the Magistrate Judge's Report and Recommendation.   He then had an opportunity to appeal the issue to the Eleventh Circuit, which he initially did, but then voluntarily dismissed.   Plaintiff plainly had a full and fair opportunity to litigate these issues.   He was simply not successful.   Plaintiff cannot litigate these factual issues again before this Court because he is dissatisfied with the outcome in <u>Shaw I</u>.

Plaintiff also argues the exhaustion analysis in <u>Shaw I</u> should not bear on the merits of his access-to-courts claim here.   Plaintiff's argument is misplaced.   Although the district court should not generally reach the merits of an underlying claim when conducting the <u>Turner</u> analysis, this rule typically applies within the same action.   <u>Bryant v. Rich</u>, 530 F.3d 1368, 1376 (11th Cir. 2008).   Plaintiff has pointed to no support for his contention that a factual determination at <u>Turner</u> step two in one case should not serve as a basis for collateral estoppel on another access-to-courts claim asserted in a later-filed suit.   This argument lacks merit.

Plaintiff's related argument that collateral estoppel should not apply to cases dismissed without prejudice likewise lacks merit.   Doc. 175 at 5.   Plaintiff asserts because his case and possibly appeal were dismissed without prejudice, the Court should not apply collateral estoppel. <u>Id.</u>   The Eleventh Circuit has held whether an action was dismissed with or without prejudice is

irrelevant to the collateral estoppel analysis.   Irvin v. United States, 335 F. App'x 821, 825 (11th Cir. 2009) (citing Christo v. Padgett, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000)).   For the reasons discussed above, all four elements necessary to apply collateral estoppel have been satisfied.

Essential to an access-to-courts claim is a showing that defendants hindered plaintiff's efforts to present a legal claim.   Bass v. Singletary, 143 F.3d 1442, 1445 (11th Cir. 1998) (citing Lewis v. Casey, 518 U.S. 343, 351 (1996)).   Here, Plaintiff contends Defendants Toole and Smith did so by destroying his March 2014 grievances.   But this Court has already determined Plaintiff did not file his March 2014 grievances, Defendants did not destroy them, and collateral estoppel applies.   Consequently, Plaintiff cannot show Defendants Toole and Smith hindered his efforts to present a legal claim—an essential element of his access-to-courts claim against these Defendants.

### 2.    *No genuine dispute of material fact.*

In addition to arguing collateral estoppel bars Plaintiff's claim, Defendants assert there is no evidence in the record showing Defendants Toole or Smith prevented Plaintiff from accessing the GDC grievance procedure.   Doc. 145-19 at 20.   As a result, Defendants argue Plaintiff cannot produce evidence these Defendants denied Plaintiff access to the courts.   Id.   Even setting aside the issue of collateral estoppel, Defendants would still be entitled to summary judgment on Plaintiff's access-to-courts claims because Plaintiff has not produced evidence to create a genuine dispute of material fact as to Defendants' hinderance of Plaintiff's access. Plaintiff only provides his own conclusory assertions that Defendants Toole and Smith maliciously destroyed his grievances.   Doc. 178 at 5, 11–12, 28–29, 32.   Plaintiff never asserts,

for example, he personally observed Defendants Toole or Smith destroying his grievances. Thus, these conclusory allegations are insufficient to create a genuine dispute.

### B.       Defendant Fountain

Plaintiff's claims against Defendant Fountain relate to a statewide grievance policy she created.   According to Plaintiff, Defendant Fountain created a policy which allowed prison officials to refuse to issue grievance receipts.   Doc. 178 at 5, 9, 11, 30, 41.   Plaintiff states Defendant Fountain intentionally designed this policy to allow prison officials to destroy inmate grievances without a paper trail.   Doc. 1 at 22; see Doc. 178 at 5 (discussing a practice of destroying grievances without mentioning Defendant Fountain).

Defendants agree there was a policy issued in a July 31, 2013 memorandum of not issuing a grievance receipt upon accepting a grievance.   Doc. 182 at 4.   However, Defendants argue Defendant Fountain issued this memorandum because Grievance Counselors were previously unable to determine whether an inmate had two pending grievances at the point of receipt.[22]   Doc. 145-1 at 12; Doc. 182 at 4.   Under this policy, the Grievance Counselor deferred issuing a receipt upon acceptance to allow a Grievance Coordinator to determine whether an inmate had two pending grievances.   Doc. 145-1 at 12.   If an inmate did not have two pending grievances, a Grievance Coordinator issued a grievance receipt.   Id.   But if an inmate did have two pending grievances, the Grievance Counselor advised the inmate to that effect and gave the inmate the option to drop an existing grievance or the newly submitted one. Id.   Once the inmate informed the Grievance Coordinator which grievance to process, he then

---

[22]       The GDC's grievance policy allows inmates to have a maximum of two pending grievances at one time, with exceptions for emergency grievances or those related to sexual abuse.   Doc. 25-2 at 8. The Eleventh Circuit has held the two-grievance limit does not render administrative remedies unavailable.   Pearson v. Taylor, 665 F. App'x 858, 868 (11th Cir. 2016).   Additionally, this Court has held the two-grievance limit is constitutional.   Daker v. Owens, No. 6:14-CV-47, 2021 WL 725668, at *13 (S.D. Ga. Feb. 22, 2021).   Defendant Fountain's memorandum is simply an outgrowth of this policy.

provided the inmate with a completed grievance receipt.   Id.   Defendants maintain this policy

was not put in place for the purpose of allowing officials to destroy inmate grievances.   Id.;

Doc. 182 at 4.   Defendants argue Defendant Fountain did not seek to purposely prevent Plaintiff

from accessing the grievance procedure, nor did she in any way hinder Plaintiff's access to the

grievance procedure.   Doc. 145-19 at 20–21.

      The Eleventh Circuit has held access to the courts is clearly a constitutional right.

Chappell v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003) (citing Bank of Jackson Cnty. v. Cherry,

980 F.2d 1362, 1370 (11th Cir. 1993)); see also Al-Amin v. Smith, 511 F.3d 1317, 1326 n.17

(11th Cir. 2008).   However, the Eleventh Circuit has not held the right of access to the courts

includes a right to access prison grievance procedures.   See Bingham v. Thomas, 654 F.3d 1171,

1177 (11th Cir. 2011).   As discussed above, a requisite element of an access-to-courts claim is

the failure to present a legal claim.   Bass, 143 F.3d at 1445.

      Plaintiff has not shown the memorandum issued by Defendant Fountain denied him

access to the courts in Shaw I.   The memorandum is neutral on its face.   If an inmate properly

submits a grievance under the memorandum and GDC policy, the inmate will still receive a

receipt for the grievance.   The memorandum merely alters the timeline and requirements for

issuing a receipt.[23]   Thus, if he had properly submitted a grievance in March 2014, Plaintiff still

would have received a receipt under the memorandum and would have been able to show he

exhausted his administrative remedies in Shaw I.   Although Plaintiff argues the policy permitted

prison officials to illegally destroy grievances, he has provided no evidence Defendant Fountain

adopted the memorandum for this reason or the policy actually facilitates this practice.

---

[23]     Plaintiff also argues the memorandum is an illegal variance from GDC policy.   Doc. 178 at 10–11, 22–23, 32.   This allegation is immaterial.   Regardless of whether the memorandum was legally adopted, Plaintiff still must show the policy denied him access to the courts, which he has not done.

Additionally, Defendant Fountain cannot be held liable for the constitutional violations of others. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").   Thus, she cannot be held liable for the alleged destruction of grievances by Defendant Toole or Smith. Plaintiff's access-to-courts claim against Defendant Fountain must also fail.

For these reasons, I **RECOMMEND** the Court **GRANT** this portion of Defendants' Motion for Summary Judgment regarding Plaintiff's access-to-courts claims against Defendants Smith, Toole, and Fountain.

## V.    Qualified Immunity

In the alternative, Defendants argue they are entitled to qualified immunity on all of Plaintiff's claims.   145-19 at 23–26.   "In order to receive qualified immunity, an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"   McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)).   Only if Defendants can meet their burden of showing they acted within their discretionary authority does the burden then shift to Plaintiff to show qualified immunity is inappropriate.   Id.

Defendants have not met their burden of showing they acted within their discretionary authority.   "A bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice."   Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (quoting Espanola Way Corp. v. Meyerson, 690 F.2d 827, 830 (11th Cir. 1982)).   Defendants' summary judgment brief devotes one sentence to establishing the discretionary authority of all seven Defendants: "In this case, all of the alleged acts occurred within the context of Defendants' alleged job functions at a state prison and were reasonably

related to their discretionary duties."   Doc. 145-19 at 24.   This sentence is not supported by any

citation to the record.   This is a bald assertion.   Moreover, Plaintiff expressly disputes whether

Defendants acted in their discretionary authority in his Response, doc. 178 at 46, and Defendants

fail to even mention it their Reply, doc. 182 at 12.   Therefore, Defendants are not entitled to

qualified immunity, as they have not met their initial burden.   However, as discussed above,

Plaintiff has not created a genuine dispute of material fact for trial as to a constitutional violation.

## VI.   Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.   Though Plaintiff

has not yet filed a notice of appeal, it is proper to address these issues now.   See Fed. R. App. P.

24(a)(3) (trial court may certify appeal of party proceeding *in forma pauperis* is not taken in

good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies the appeal is not

taken in good faith.   28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).   Good faith in this

context must be judged by an objective standard.   Busch v. County of Volusia, 189 F.R.D. 687,

691 (M.D. Fla. 1999).   A party does not proceed in good faith when he seeks to advance a

frivolous claim or argument.   See Coppedge v. United States, 369 U.S. 438, 445 (1962).   A

claim or argument is frivolous when it appears the factual allegations are clearly baseless or the

legal theories are indisputably meritless.   Neitzke v. Williams, 490 U.S. 319, 327 (1989);

Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).   Thus, a claim is frivolous and not brought

in good faith if it is "without arguable merit either in law or fact."   Moore v. Bargstedt, 203

F. App'x 321, 323 (11th Cir. 2006) (quoting Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir.

2001); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2

(S.D. Ga. Feb. 9, 2009).

Based on the above analysis, there are no non-frivolous issues to raise on appeal, and an appeal on these claims would not be taken in good faith.   Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal.

## CONCLUSION

For the reasons set forth above, I **RECOMMEND** the Court **GRANT** Defendants' Motions for Summary Judgment, doc. 145, **DIRECT** the Clerk of Court to **CLOSE** this case and enter the appropriate judgment, and **DENY** Plaintiff *in forma pauperis* status on appeal.

Any objections to this Report and Recommendation shall be filed within 14 days of today's date.   Objections shall be specific and in writing.   Failure to file timely, written objections will bar any later challenge or review of the Magistrate Judge's factual findings and legal conclusions.   28 U.S.C. § 636(b)(1)(C); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1192–93 (11th Cir. 2020).   To be clear, a party waives all rights to challenge the Magistrate Judge's factual findings and legal conclusions on appeal by failing to file timely, written objections.   Harrigan, 977 F.3d at 1192–93; 11th Cir. R. 3-1.   A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge.   Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.   Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO REPORTED AND RECOMMENDED**, this 19th day of May, 2021.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA